IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| A███ J███ V████████, by and through his parents and next friends, | * | |
| E███ and C█████████ V█████ ████████ ██████████ | * | REDACTED VERSION |
| | * | |
| Plaintiffs | * | |
| | * | |
| *v.* | * | Civil Action No. |
| CARROLL COUNTY BOARD OF EDUCATION Serve On: Marsha B. Herbert, President 125 North Court Street Westminster, Maryland 21157 | * * * | |
| And | * | |
| CHRIS WITTLE (Officially) Director of Special Education Carroll County Public Schools 125 North Court Street Westminster, Maryland 21157 | * * * | |
| And | * | |
| CYNTHIA MCCABE (Officially) Superintendent, Carroll County Public Schools 125 North Court Street Westminster, Maryland 21157 | * * * | |
| Defendants | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES AND COSTS**

COME NOW Plaintiffs A███ J█ V███████ (a.k.a. "AJ") by his parents and next friends, E████ and C████████ V███████, against Defendants, CARROLL COUNTY BOARD OF EDUCATION, CHRIS WITTLE, and CYNTHIA MCCABE, stating as follows:

***NATURE OF ACTION***

Plaintiffs bring this action as aggrieved parties from an adverse decision issued by an Administrative Law Judge of the Maryland Office of Administrative Hearings pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*

**JURISDICTION**

This Honorable Court has jurisdiction over this matter pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and 42 U.S.C. § 12133.  This Court has pendant jurisdiction pursuant to Md. Code Ann., Education Article, § 8-401 *et seq.* Plaintiffs bring this Complaint seeking review of a decision of the Maryland Office of Administrative Hearings, MSDE-CRRL-OT-24-02944, rendered on June 21, 2024.  Venue is appropriate as all parties reside in, or are employed in Carroll County, Maryland.

**PARTIES**

1. A███ J█ V███████ (hereinafter "AJ"), is a minor child (D.O.B. February 24, 2011) and a student with a disability as that term is defined by the IDEA. As a result, AJ is entitled to receive special education services under the IDEA, 201 U.S.C. § 1400 *et seq.*, 34 C.F.R. Part 300, and by incorporation, pertinent provisions of the MD. EDUC. CODE ANN. § 8-401 and its implementing regulations, COMAR § 13A.05.01.  AJ has at all times relevant to this action resided in Carroll County, Maryland.

2. E▮ and C▮▮ V▮▮ (hereinafter, "Parents") are the parents of AJ and, at all times relevant to this action, have resided in Carroll County, Maryland. E▮ and C▮▮ V▮▮ sue on behalf of AJ and in their own rights.

3. Carroll County Board of Education (hereinafter, the "Board") is responsible for overseeing the management, administration, and quality of instruction for students in Carroll County's public school system.

4. Carroll County Public Schools (hereinafter, "CCPS") is a local education agency as defined by 20 U.S.C. § 1401(19) and is responsible for complying with federal law and state law with respect to the provision of a free appropriate public education (FAPE) to children with disabilities residing in Carroll County, Maryland. Chris Wittle serves as Director of Special Education for CCPS. Cynthia McCabe serves as Superintendent of CCPS.

## Factual Allegations

5. AJ is a thirteen-year-old boy who currently resides with his Parents. Parents adopted AJ from Korea when he was 17 months old.

### Early History

6. From very early on, it was clear that AJ is extremely bright. AJ was inquisitive, retained new information with ease, and quickly took to reading, effortlessly progressing beyond his grade level.

7. While attending CCPS's Manchester Elementary School in 2016-2017 (Kindergarten) and 2017-2018 (first grade), AJ began exhibiting behavioral and social difficulties. Initially, AJ displayed off-task, intentionally distracting and at-times unsafe behaviors in school. Over time, AJ's behaviors worsened, as characterized by verbal defiance of teachers and aggressive contact with other students.

8.   Also in 2016, AJ began displaying tic-like behaviors which at times took the form of rapid eye blinking, rapid head movements, clearing his throat, smacking his lips, and more.

9. On January 31, 2018, Wendy Sulc, PhD, evaluated AJ to better understand AJ's neuropsychological profile.

10. Dr. Sulc used the Wechsler Intelligence Scale for Children – Fifth Edition (WISC-V) to measure AJ's general intellectual ability. Dr. Sulc noted significant relative discrepancies in AJ's performance on the various subtests. Specifically:

- Verbal Comprehension Index[1] - Extremely High range (98th percentile).
- Visual Spatial Index[2] - High Average range (87th percentile).
- Working Memory Index[3] - High Average (79th percentile).
- Fluid Reasoning Index[4] - Average Range (58th percentile).
- Processing Speed Index[5] - Average Range (50th percentile)
- Naming Speed index[6] - Average Range (39th percentile).

11. Since the spread between AJ's highest index and lowest index score exceeded 30 points, AJ's full-scale IQ of 117 (87th percentile), could not be meaningfully interpreted or relied on, and the individual indices provided a better snapshot of his capabilities. In looking at the individual indexes, Dr. Sulc determined AJ's very superior verbal cognitive abilities aligned with a gifted diagnosis.

12. Dr. Sulc explained the wide spread in scores likely resulted in frustrations for AJ:

---

[1] The Verbal Comprehension Index (VCI) measures verbal concept formation, verbal reasoning, and acquired knowledge.
[2] The Visual Spatial Index (VSI) is an estimate of broad visual intelligence, visual-spatial reasoning, and the ability to analyze visual detail.
[3] The Working Memory Index (WMI) is an estimate of auditory and visual working memory capacity, or the ability to temporarily store spoken or visual information while performing some active transformation or manipulation of it.
[4] The Fluid Reasoning Index (FRI) measures abstract thinking, the ability to identify conceptual relationships, and the ability to use reasoning to identify and apply rules.
[5] The Processing Speed Index (PSI) provides an estimate of decision speed and the speed with which a person can solve low difficulty paper-pencil problems over the span of a few minutes
[6] The Naming Speed Index (NSI) is a measure of cognitive speed. The NSI provides a broad estimate of automaticity of basic naming ability drawn from a variety of tasks.

A 30-point discrepancy between verbal reason and speed of information processing suggests that AJ is likely to have very advanced, well thought out responses in his head that do not always translate well to paper, and he may struggle to get them out quickly enough before they are forgotten.

13. In addition, Dr. Sulc diagnosed AJ with Attention Deficit Hyperactivity Disorder (ADHD), combined type. Dr. Sulc found that in AJ, ADHD manifests as "significant difficulty with regulation of behavior, emotion, and impulse across environments, with negative impact on social, adaptive and family functioning."

14. AJ's co-occurring diagnoses - giftedness and ADHD - resulted in a "complex neurocognitive profile" known as *twice exceptional* (hereinafter, 2E).

15. In light of her evaluation of AJ, Dr. Sulc made the following educational recommendation, in part:

- Determine eligibility Individualized Education Program (IEP) or Section 504 Plan;

- Conduct a functional behavioral assessment (FBA) and implement appropriate behavioral interventions which she further described;

- Provide "high degree of structure and routine, multi-modal/multisensory activities and small group and one-on-one work with a teacher or skilled paraeducator whenever possible"; and

- "AJ's educational program may need to be individualized to address his difficulties with attention and off-task behavior while allowing him to use his strengths to engage him in learning."

16. On May 23, 2018, based on Dr. Sulc's report and other testing, a CCPS IEP team determined AJ eligible for special education under the disability code Other Health Impairment.

17. In May and June 2018, CCPS conducted an FBA and developed a behavior intervention plan (BIP) for AJ, as recommended by Dr. Sulc.

18. Despite the IEP and BIP, AJ's behaviors worsened in ensuing years.

19. In 2019/2020 (3rd grade), while attending Manchester Elementary School, AJ had a total of 40 disciplinary referrals from the start of the school year through March 13, 2020, when school closed due to the pandemic. The referrals were for multiple instances of classroom disruption, disrespect, unsafe behavior, physical contact, and out-of-assigned area.

20. Despite his young age, school personnel repeatedly resorted to use of restraint and seclusion in response to AJ's behaviors.

21. In 2020/2021 (4th grade), AJ received a total of 9 referrals even though learning was *virtual the entire year.* These referrals were for verbal threat, disrespect, and technology violations.

### 2021/2022 (Fifth Grade)

22. AJ began in-person learning again for the 2021/2022 school year (5th grade), as a student in Spring Garden Elementary School. Parents requested the switch from Manchester to Spring Garden due to AJ's increasing referrals at Manchester, a high rate of special education staff turnover, and the mounting episodes of restraint and seclusion that eroded their trust in Manchester's ability to educate AJ.

23. By October 2021, Spring Garden had effectuated its first restraint of AJ.

24. By early November 2021, less than three months after his arrival at Spring Garden, AJ had received 33 disciplinary referrals. AJ was growing more and more anxious and depressed and spending less and less time in general education. In addition, AJ had made 23 suicide threats that CCPS reported to Parents.

25. On November 5, 2021, CCPS School Psychologist and Behavior Support Specialist conducted an updated FBA in an effort to address AJ's spiraling behaviors. The FBA noted, AJ's behavior:

continues to significantly impact safety of himself and others, his personal learning and the learning environment of others, and his social relationships. Additionally, AJ is not responding to current least restrictive behavioral interventions and his noted behaviors have increased in physicality since the previous school year.

26. As part of the FBA, the following interventions were trialed:

- Increase choices and project-based learning opportunities
- Use of technology and blended learning strategies
- Using his interests to engage in work
- Reducing the workload and classroom expectations

27. On November 11, 2021, the IEP team finalized an updated BIP, based on the new FBA. The BIP targeted physical contacts, threats, and elopement. In the section on response strategies, the BIP provides, "If [AJ] is able to calm without disrupting the class, AJ may stay in the classroom. Otherwise, AJ will need to calm in one of the support room locations." The BIP further notes, AJ should utilize the support room only if he "chooses to calm" down there, "OR if his behaviors escalate to the point of physical attack OR his behaviors cause safety concerns to himself or students/staff." The BIP does not specify how AJ is to get to the support room in the latter scenarios but does cite COMAR regulations regarding the use of physical restraint in an emergency situation, and notes that the IEP team will meet within 10 business days of a restraint to review AJ's IEP and BIP.

28. On November 12, 2021, the IEP team produced an amendment to AJ's then current IEP. The amended IEP stated the following with regard to restraint/seclusion:

**Has the school-based IEP team determined that restraint and/or seclusion may be required as part of the Behavior Intervention Plan?** Yes

**Does the parent consent to the use of restraint as part of Behavior Intervention Plan?** No – date of written refusal: 11/23/2021

**Document basis for decisions:**

AJ requires a BIP in order to support his difficulties with emotional regulation.

> The IEP team identified there is a need for restraint when he is escalated to the point where he is a danger to himself and others. […]
>
> The IEP team will meet after every restraint to review the incident and make changes to the IEP.

29. From November 2021 through February 2022, despite the revised IEP and BIP, AJ's behaviors continued their downward spiral.

30. By February 2022, Spring Garden told the Parents that they could not handle or help AJ. As a result, on February 2, 2022, the IEP team convened to review AJ's individualized program and determine an appropriate placement for him.

31.  Though they were meeting due to AJ's escalating behaviors, the IEP team removed, without any explanation, the statements indicating that "the IEP team identified there is a need for restraint when he is escalated to the point where he is a danger to himself and others" and that the team would "meet after every restraint to review the incident and make changes to the IEP." According to the prior written notice (PWN), which summarized the February 9, 2022 changes to the IEP and BIP, the IEP team removed the reference to the COMAR regulations governing the use of physical restraint in an emergency situation.  The PWN clarifies, however, "although the statements were removed from within the IEP involving restraint, it was explained that restraint can still be used as a last possible resort, and by trained staff, if AJ is presenting a danger to himself or others."

32. The PWN additionally notes that Parents advocated for the IEP team to list AJ's 2E status within AJ's eligibility on the IEP. However, the IEP team rejected the request, opining,

> AJ does not receive special education services and does not require an IEP for being Twice Exceptional. The parents were in disagreement with not including Twice Exceptional within his eligibility.

33. Jen Richotte, educational advocate who attended the meeting and later testified as an expert in special education at the due process hearing, explained the importance of including AJ's 2E status on the IEP as part of AJ's eligibility determination and in planning for his individualized education, stating that for 2E kids,

> [y]ou really have to be able to target their high academic abilities, while also being able to help adjust those skill deficits based on their disability, and if their high academic interests are not addressed it can lead to dysregulation, they can be unavailable for learning, they can be bored very easily, which can really exacerbate the situation.

34. In other words, in failing to recognize the significance of AJ's 2E status when crafting an IEP and BIP for him, the IEP team ignored a crucial aspect of AJ's disability profile that could have shed light on some of the behaviors CCPS was seeing from AJ and informed his programming.

35. As a result of the February 2, 2022 IEP meeting, the IEP team recommended that AJ attend Robert Moton Elementary School – Behavioral and Emotional Support Team (BEST) Program.

36. In light of the team's recommendation, Parents toured the BEST program. BEST was accessed through secured doors inside Robert Moton Elementary School. BEST had two seclusion rooms, as well as a cabinet of rewards. AJ's classroom had two other students; the cohort of three was to be taught by a special education teacher. The classroom also had a table for additional support personnel. The Parents were reassured by others that BEST staff were well trained to educate a student like AJ and that restraint and seclusion would be used "only as a last resort." Parents were assured that the BEST program would be able to meet AJ's needs. Parents agreed to the placement, hoping it would be a positive one for AJ.

37. Prior to AJ's first day in the BEST program, Parents provided the principal and assistant principal of Robert Moton with a letter dated February 26, 2022, from Dr. Steven C. Della Vecchia, AJ's therapist. Dr. Della Veccia stated in his letter that "using any restraints/hands-on techniques or use of seclusion will be harmful to AJ as well as detrimental to his rapport with school staff." Dr. Della Veccia elaborated that:

> My recommendation is to avoid restraints and seclusion. In the past, AJ has escalated significantly when staff have used restraints with him. Additionally, in the past he has been placed in seclusion rooms, where he has engaged in significant self-injurious behavior including head banging. In addition to the self-injury, the use of restraint and seclusion in the past has caused lingering trauma.
>
> In my experience, when AJ is upset, if he is provided with non-confrontational redirection and tone, he is able to get himself together and will follow directions. Much of his acting out behavior is related to work avoidance. However, he tends to be able to do the work, he just gets bored and would rather read. If he has a reinforcement program for doing work and is not attended in a confrontational manner, he generally remains safe, thus not requiring hands on to keep people safe.

38. At hearing, Dr. Della Veccia clarified AJ's trauma would be triggered not only by being restrained and secluded himself, but by witnessing others being restrained and secluded as well.

39. AJ began attending BEST on Monday, February 28, 2022. According to AJ's father, AJ was "very excited" to attend BEST. AJ was promised a lot of things – that there would be rewards, there would be other children like him, and that this was the right fit.

40. After a positive first day at BEST, things "rapidly declined." By Thursday, March 3, 2022, Parent's received a report that AJ "swung at support staff" and "swung and hit" his teacher in the chest. The incident summary stated that AJ was "walked to small support."

41. In contrast, AJ reported to Parents that BEST personnel "dragged" him down the hall which would be considered restraint.

42. The following Monday, March 7, 2022, Parents received a second incident report. By Tuesday, March 8, 2022, when AJ's father picked him up for BEST, AJ was "emotionally distraught," sobbed and "tic-ed" uncontrollably the whole way home, and for ten more minutes once he entered his home.

43. In an email to the principal on March 9, 2022, AJ's father noted, "it is very unusual for AJ to [sob and tic like] this and he later told us he was upset about being 'dragged' to the support room." AJ's father requested that the principal relate,

> what precipitated his need to go to the support room, where he was within the building, who was involved in the "dragging" he described, and what happened once he was there? We're hoping to shed some light on why he absolutely refused to go to school this morning.

44. AJ's parents never received an explanation from school personnel.

45. From March 10 through March 14, AJ relayed to his parents that he was again transported to the support room. He specified that "he tried to lay down, but he was lifted and his feet were behind him." When Parents asked CCPS for context, input and explanation, they were again provided with no answers.

46. By March 18, 2022, Parents asked BEST to provide schoolwork for AJ to work on at home and for an emergency IEP meeting to address the issues at BEST.

47. On March 24, 2022, AJ's parents attempted to bring him to BEST. AJ refused to leave the car when he arrived at school, despite attempts by both his parents and BEST staff to get AJ to enter the building.

48. On March 28, 2022, AJ again refused to enter the BEST building. BEST staff spent over twenty minutes attempting to convince AJ to leave the car using positive persuasion techniques and offers of rewards. All attempts failed.

49. On April 27, 2022, an IEP meeting was finally held. The Parents attended the meeting along with educational consultant, Jen Richotte, AJ's therapist, Dr. Della Veccia, and Dr. Wendy Sulc, neuropsychologist.

50. Dr. Sulc had evaluated AJ in 2018, and met with him in March 2022 to update her evaluation.  At the meeting, Dr. Sulc orally shared that due to his 2E status (verbally gifted and ADHD), AJ requires,

> a faster pace of learning and significantly differentiated instructional strategies. Emphasizing behavioral management strategies at the expense of capitalizing on AJ's love of learning, and his ability to learn at a faster pace, will lead to increased oppositionality and defiance, and more importantly, diminish his enjoyment of learning, which is what AJ thrives on. Thus, effective strategies to manage emotional and behavioral challenges need to be a focus, but his continued academic achievement as a high-aptitude student also needs to be addressed.

51. As a result of the IEP meeting, the IEP team recommended a private, separate day school (PSDS) as A███s educational placement. It was anticipated the PSDS placement would place AJ outside of the general education environment, with no access to non-disabled peers, for the full academic day. The team justified the restrictive placement, noting that that the small, structured learning environment, specialized instruction, counseling services, and integrated proactive behavioral supports that that AJ required could not be provided in the general education classroom setting.

52. For related services, the IEP team proposed (1) occupational therapy (OT), twice a week for 20-minute/session, outside general education to address sensory processing needs, and (2) counseling services, five times a week for 20-minute/session, outside general education to address social-emotional needs.

53. The IEP team also included OT and counseling on the IEP as consultation services to support AJ's classroom teachers and parents.

54. At this meeting, Parents reiterated their strong opposition to the use of restraint and/or seclusion with AJ.

55. The prior written notice summarizing the IEP meeting states CCPS would use the following criteria when referring AJ to PSDSs for consideration:

- MSDE approved Type I educational program;
- Services students with other health impairment;
- Ability to provide grade-level instruction as A██ is diploma bound;
- Ability to meet AJ's social/emotional/behavioral needs though counseling services and BIP;
- Ability to provide crisis counseling and crisis management;
- Ability to provide an extended school year or limited school breaks through a longer school year;
- Consideration for a BCBA;
- Consideration to time, travel, and distance.

56. Ms. Kristin Hoffman, the CCPS Coordinator of Nonpublic Placements, did not include ability to meet AJ's need for a faster pace of learning and significantly differentiated instruction to address his giftedness in the criteria for a PSDS.

57. Ms. Hoffman did not include Dr. Della Veccia's letter that stated restraining and secluding AJ is contraindicated due to past trauma in the packet sent to schools, nor did she summarize or reference it in the criteria for a PSDS.

58. Ms. Hoffman stated she did not include Dr. Della Veccia's letter, as "restraint and seclusion was not part of the IEP."

59. CCPS initially referred AJ to five private separate day schools – Baltimore Lab School, Gateway School-Hearing and Speech Agency, Laurel Hall-Frederick, Sheppard Pratt-Glyndon, and St. Elizabeth School – all of whom declined to accept AJ.

60. CCPS then sent additional applications to Kennedy-Krieger School, Arrow School, and High Road School in Middle River.

61. CCPS and the parents agreed that High Roads was inappropriate as it lacked a program for gifted students, had a lower-functioning student body overall, was far and AJ would need to arrive by taxi, and there were metal detectors at the front door.

*Potential PSDS #1 for the 22/23 School Year – The Arrow School*

62. On July 13, 2022, the Arrow School accepted AJ. Unlike the other schools that actively considered AJ's application, the Arrow School did not request to meet AJ to ensure he would be a good fit for the program prior to issuing the acceptance.

63. On July 15, 2022, the Parents went with AJ to tour the Arrow School.

64. AJ's father testified that Arrow stated they did not have a gifted program. Arrow School personnel also "talked about [AJ's] IEP and his BIP directly in front of him."

65. AJ's father further testified that the classrooms were located in a musty basement, where the smell "hit" you. There were two prominent seclusion rooms that were lined with plywood and sealed with a heavy door. One had to pass the seclusion rooms to get to the classrooms. In addition, the floors were sticky, creating "a big sensory issue" for AJ.

66. AJ's father noted AJ appeared anxious and scared during the tour of Arrow; he clung to his mother's side the entire time. AJ mentioned the sticky floors. AJ clearly did not feel comfortable at Arrow.

67. AJ's father testified that based on AJ's prior trauma and school refusal while he was enrolled in CCPS and the BEST program, as well as AJ's behavior during the tour, it was clear to AJ's parents, "we would never been able to get him in [the Arrow] building."

68. On September 2, 2022, the Parents sought clarity from Arrow regarding their restraint and seclusion policies. They included Dr. Della Veccia's letter for Arrow administration's consideration. They highlighted that use of restraint and seclusion with AJ was contraindicated

due to trauma, and asked for confirmation that it would not be used with AJ under any circumstances.

69.  On September 5, 2022, Mr. Adam Hughes of Arrow responded that,

> Arrow's policy regarding restraint and seclusion is that if a student is exhibiting continuous acts of physical aggression, self-injurious behaviors, and/or a high magnitude disruption; a PCM trained staff can implement a PCM restraint. A member of the clinical social work staff can authorize the implementation of seclusion.

70. Mr. Hughes did not acknowledge Dr. Della Veccia's statement regarding AJ's trauma, nor did he indicate if and how Arrow's policy could be modified in light of the contraindication.

71. Based on their tour of Arrow, and subsequent dialogue with Arrow regarding restraint and seclusion, the Parents understood Arrow could not provide AJ with a free and appropriate public education and declined to enroll AJ in Arrow for the 22/23 school year.

*Potential PSDS #2 for the 22/23 School Year – Kennedy Krieger School*

72. On August 15, 2022, Kennedy Krieger indicated they "may" have one spot for AJ.  Later that morning, Kennedy Krieger's Associate Director of School Operations, Ms. Brooke Shivers, emailed Parents to set up an intake interview. She noted the interview would be the first of a two phased admission process, prior to Kennedy Krieger deciding whether AJ was appropriate for their program.

73. The Parents responded immediately, setting up an appointment to see Kennedy Krieger on September 16, 2022.

74. On September 2, 2022, AJ's mother emailed Ms. Shivers. As with Arrow, AJ's mother provided Ms. Shivers with a copy of Dr. Della Veccia's letter and highlighted that the use of restraint and seclusion with AJ was contraindicated due to trauma. She sought clarity from Ms.

Shivers regarding Kennedy Krieger's policy for the use of restraint and seclusion and asked for confirmation that it would not be utilized with AJ.

75. On September 7, 2022, Ms. Shivers replied to the Parents. She noted that Kennedy Krieger's,

> behavior philosophy is one that focuses on proactive strategies, de-escalation techniques, rapport building and providing dense reinforcement to shape behaviors. Seclusion and/or restraint is only used if there is an imminent safety risk to the students and/or staff.

76. Ms. Shivers concluded, "there is no guarantee that a situation might not arise that would require us to use a more restrictive intervention to maintain safety" as a "last resort."

77. On September 15, 2022, AJ's mother responded to Ms. Shivers, thanking her for the transparency and cancelling the September 16 appointment in light of the school's position on restraint and seclusion.

*Fusion Academy of Columbia*

78. Beginning in May 2022, Parents began researching whether Fusion Academy of Columbia (Fusion) would be an appropriate placement for AJ.

79. Fusion is a private school, whose curriculum is approved by a private accreditation board called Cognia. Fusion is approved by MSDE as a private school but not as a Type I private school.

80. At Fusion, all classes are conducted in a one-to-one format. The student body is comprised of both disabled (i.e. with an IEP) and non-disabled students.

81. Philosophically, Fusion uses a relationship-based model of teaching, understanding that any classroom success – academic, behavioral, and/or social – will not happen without a foundation of connection and relationship.

82. Academically, Fusion uses a mastery model. In a mastery model, students do not move on to later content in a course until they have demonstrated mastery of earlier curricular objectives. A mastery model allows for a variable pace, enabling a student who has a series of rough days to pick up where the student left off once the student is again available for education.

83. Fusion has three spaces where students who are otherwise in 1:1 instruction can socialize and/or work together, collectively called the Homework Café. Students may access these spaces informally multiple times throughout the day (arrival, between classes, dismissal, etc.). Students may also have formal, supported time in the homework café as part of a social skills curriculum.

84. Fusion maintains a sensory controlled environment, including carpeted floors, soft lighting, and, at times, low music.

85. In August 2022, AJ attended two separate trial classes at Fusion, which included some time in the Homework Café. In addition, Fusion received and reviewed AJ's most recent IEP and testing, and spoke with his therapist, Dr. Della Veccia.

86. At the end of August, Fusion offered AJ a spot for the 2022/2023 school year.

87. On September 15, 2022, Parents notified CCPS of their intention to unilaterally place AJ at Fusion for the 2022/2023 school year.

*2022/2023 (Sixth Grade)*

88. AJ began attending Fusion in October 2022. Initially, AJ took a single non-credit bearing ("tutor-mentor" or TM) class twice a week. A couple of weeks in, AJ's schedule increased to two TM classes, twice a week. By March 2023, AJ began attending Fusion five days a week and was enrolled in his first credit bearing course. In April 2023, AJ's schedule increased to two-credit bearing courses over a five-day period.

89. According to Jacalyn Herrell, Fusion Campus Director, the slow build – from few days to a full week and from non-credit to credit bearing classes – was intentional. The slow build provided AJ, who was coming to Fusion after a really painful school history, the opportunity to become familiar with the Fusion campus and to build trust with Fusion staff. During this time period, Jacalyn Herrell emerged as AJ's "trusted adult" on the Fusion campus.

90.     Throughout the 2022/2023 school year, AJ consistently attended classes at Fusion, engaged with teachers, staff and students, and passed all his credit bearing classes.

91. When AJ did get dysregulated, Fusion's one-to-one relationship-based model enabled AJ to reengage or de-escalate as needed. Specifically, AJ's teachers were empowered to pivot as necessary, altering, for example, the manner of presenting information or the task to abet his reengagement and de-escalation. In addition, when AJ required more than a pivot, he was able to turn to Ms. Herrell, as his trusted adult, who used varied techniques to assist AJ in identifying why he was dysregulated, naming his feelings, and coming up with solutions.

92. Fusion did not restrain or seclude AJ at any point during the 2022/2023 school year.

93. Fusion provided differentiated instruction to simultaneously meet AJ's giftedness and ADHD during the 2022/2023.

94. Fusion provide AJ with access to disabled and non-disabled peers throughout 2022/2023.

*2023/2024 (Seventh Grade)*

95. On August 14, 2023, the IEP team convened to review AJ's IEP for the 2023/2024 school year. The meeting was continued on August 22, 2023.

96. These meetings were held 16 months after AJ's last IEP had been finalized. The meetings also did not conform to the prior review schedule, which mandated AJ's IEP be reviewed annually in the month of May.

97. On June 6, 2023, in light of the delayed meeting and seeking to ensure AJ would not be left without a placement for 2023/2024, Parents re-enrolled AJ at Fusion for the 2023/2024 school year.

98. Parents, however, continued to participate in good faith in the subsequent August IEP meetings.

99. At the IEP meetings, the IEP team made numerous and significant changes to AJ's IEP, only some of which are outlined in the ensuing paragraphs.

100. The team agreed to remove AJ's behavior plan, since at Fusion, AJ no longer presented with the behaviors the BIP targeted, namely physical contact, threat, and elopement.

101. The team added "unique timing and scheduling accommodation" to AJ's IEP, based on his success with Fusion's model, which allowed him to demonstrate mastery at his own pace and multiple opportunities to complete assignments.

102. The team removed the social/behavioral support of crisis counseling, replacing it with additional adult support for problem solving, based on AJ's demonstrated success with trusted adult Jacalyn Herrell and demonstrated lack of success with crisis counseling in all prior placements.

103. The team added the program modification of modified school day, based on Fusion's successful intentional integration of AJ into their program, starting with a single class and building up. At the time of the meeting, AJ was attending 10 hours a week of class at Fusion.

104. Over Parents' objection, the IEP team proposed increasing AJ's instructional time to 17 hours per week. Parents objected, concerned about the effect the arbitrary increase from 10 to 17 hours would have on AJ, following Fusion's slow and intentional build-up to 10 hours.

105. Over Parents' objection, the IEP team proposed four 30-minute sessions of counseling for AJ per week. The IEP team justified the retention of counseling services in order to ensure AJ "can identify when he is frustrated or overwhelmed," state what he needs, select a coping strategy, and return from a break. The Parents objection noted that AJ was successfully working on all those skills at Fusion, without counseling, evidencing that in the proper environment, AJ did not require counseling. In addition, AJ had access to private counseling sessions outside of school time.

106. Over Parents' objection, the IEP team proposed retaining two 20-minute sessions of OT on AJ's IEP. The Parents' objection was based on AJ's success in Fusion's sensory controlled environment, which showed that in the proper environment, AJ did not require OT.

107. The IEP team again recommended a PSDS for AJ, as his LRE.

108. The Parents shared they felt AJ should attend Fusion for the 2023/2024 school year, based on his demonstrated success at Fusion in 2022/2023. However, the Parents requested the list of schools CCPS would refer AJ to for consideration. In response, Ms. Hoffman shared CCPS would send referrals to Sheppard-Pratt Glyndon, Kennedy Krieger Fairmont, and Pathways.

109. At the due process hearing, AJ's father testified that Parents would have considered Pathways, as it utilized a similar 1:1 teaching model as Fusion and did not use restraint and seclusion.

110. On September 25, 2023, over a month after the IEP meeting, Ms. Hoffman sent Parents a draft IEP in connection with the August IEP meetings. CCPS never sent Parents a final, approved IEP.

111. Ms. Hoffman also waited until September 25, 2023, well after the 2023/2024 school year began, to send out the referrals to Sheppard-Pratt Glyndon, Kennedy Krieger Fairmont, and Pathways (Referred Schools).

112. Ms. Hoffman's letter to the Referred Schools stated,

> After review of the provided documentation, if you feel that A▇ may be an appropriate candidate for your program, please reach out to the family for next steps. We are looking for this placement to start as soon as possible.

113. Parents received no communications from any of the Referred Schools.

114. Similarly, Ms. Hoffman did not receive any responses from the Referred Schools. Ms. Hoffman testified she made no effort to follow up on the referrals.

115. Ms. Hoffman admitted at hearing that Fusion was the only school that accepted AJ for the 2023/2024 school year.

116. AJ attended Fusion for 2023/2024 school year.

117. AJ continued on the trajectory he began in 2022/2023, showing remarkable progress socially, emotionally, and academically over the course of the year.

118. Fusion did not restrain or seclude AJ at any point during the 2023/2024 school year.

119. Fusion provided differentiated instruction to simultaneously meet AJ's giftedness and ADHD during the 2023/2024.

120. Fusion provided AJ with access to both disabled and non-disabled peers during the 2023/2024 school year.

*Due Process Complaint and Hearing*

121. On January 31, 2024, the Parents filed a Due Process Complaint with the Maryland Office of Administrative Hearings.

122. In their complaint, Parents alleged CCPS denied AJ a FAPE in the following ways:

- CCPS failed to offer an education program for the 2022/2023 school year which could provide AJ with a FAPE;

- CCPS failed to act in accordance with IDEA's procedural requirements in developing an IEP for the 2022/2023 school year;

- CCPS failed to offer an education program for the 2023/2024 school year which could provide AJ with a FAPE; and

- CCPS failed to act in accordance with IDEA's procedural requirements in developing an IEP for the 2023/2024 school year.

123. In their complaint, Parents further alleged AJ received appropriate educational benefit from Fusion during the 2022/2023 and 2023/2024 school years, making it an appropriate placement pursuant to the IDEA.

124. On April 1, 2024, Parents filed an Amended Complaint, explicitly alleging that AJ's trauma in connection with restraint and seclusion included the potential for re-trauma if he were to witness a peer being restrained or secluded.

125. A due process hearing was held over the course of nine days in May (May 6, 8, 9, 13, 15, 16, 17, 21 and 22).

126. The ALJ issued his decision on June 21, 2024. The ALJ held that CCPS had developed appropriate IEPs for the 2022/2023 and 2023/2024 school years. The ALJ further held CCPS did not fail to act in accordance with the procedural requirements for the 2022/2023 and 2023/2024 school years, because CCPS's acts or omissions did not impede AJ's right to FAPE, significantly impede the Parents' opportunity to participate in the decision-making process regarding the provision of FAPE to AJ, or cause deprivation of educational benefit. The ALJ denied Parents' request for reimbursement of Fusion's tuition for the 2022/2023 and 2023/2024 school years.

## COUNT I

127. Paragraphs 1-126 are incorporated herein as if fully stated.

128. The ALJ erred as a matter of fact and law in holding that the Board's procedural violations in developing AJ's 2022/2023 and 2023/2024 IEPs did not deny AJ a FAPE or deny Parents' meaningful participation in the IEP process for both years, as required by 20 U.S.C. §1412(a)(1) and §1412(f)(3).

129.  The ALJ erred as a matter of fact and law in holding that the IEPs developed by the Board for the 2022/2023 and 2023/2024 school years were reasonably calculated to meet AJ's needs and offered AJ a FAPE for the 2022/2023 and 2023/2024 school years as required by 20 U.S.C. §1412(a)(1).

130. The ALJ erred as a matter of fact and law in denying Parents' request for reimbursement of Fusion tuition for the 2022/2023 and 2023/2024 school years.

## RELIEF REQUESTED

WHEREFORE, the Plaintiffs request that this Honorable Court:

1.  REVERSE the decision of the ALJ and enter a finding that the Board failed to offer AJ a free and appropriate public education for the 2022/2023 school year;

2.  REVERSE the decision of the ALJ and enter a finding that the Board failed to offer AJ a free and appropriate public education for the 2023/2024 school year;

3.  REVERSE the decision of the ALJ and order the Board to reimburse the Plaintiffs for the cost of AJ's placement at Fusion Academy of Columbia for the 2022/2023 school year; and

4.  REVERSE the decision of the ALJ and order the Board to reimburse the Plaintiffs for the cost of AJ's placement at Fusion Academy of Columbia for the 2023/2024 school year.

5.  Order such further relief as justice demands.

RESPECTFULLY SUBMITTED,

_____ -s-
Wayne Steedman, Bar No. 09474
wayne@steedmanlaw.net

_____ -s-
Cheryl Steedman, Bar No. 30003
cheryl@steedmanlaw.net

_____ -s-
Olivia Miller, Bar No. 30640
olivia@steedmanlaw.net


The Steedman Law Group, LLC
Bel Air Square
260 Gateway Drive, Suite 11-12B
Bel Air, Maryland  21014
410-645-0625 (office)
410-657-2767 (facsimile)

Counsel For Plaintiffs