## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**A.J.V., by and through his parents and next friends, E.V. and C.V.,**

        *Plaintiffs*,

        v.

**CARROLL COUNTY BOARD OF EDUCATION, *et al.*,**

        *Defendants*.

Civil No.: 1:24-cv-02543-JRR

## <u>MEMORANDUM OPINION</u>

Pending before the court are the parties' cross motions for summary judgment: Plaintiffs' Motion for Summary Judgment (ECF No. 26; "Plaintiffs' Motion") and Defendants' Cross-Motion for Summary Judgment (ECF No. 30; "Defendants' Motion"). Plaintiffs are minor child A.V., by and through his parents and next friends, E.V. and C.V. Defendants are Cynthia McCabe in her official capacity as Superintendent of Schools, Chris Wittle in his official capacity as Director of Special Education, and the Carroll County Board of Education (the "Board"), which operates Carroll County Public Schools ("CCPS" or "the school district"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, Plaintiffs' Motion will be denied, and Defendants' Motion will be granted.

# I.    BACKGROUND[1]

## A. The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017).  FAPE refers to:

> [S]pecial education and related services that—
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).  Where the State accepts IDEA's financial assistance, "[a]n eligible child . . . acquires a 'substantive right' to such an education."  *Fry*, 580 U.S. at 158.

The "primary vehicle" for providing a FAPE to an eligible child is through an Individualized Education Program ("IEP").  *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see Fry*, 580 U.S. at 158 (acknowledging same).  "The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'"  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting *Honig*, 484 U.S. at 311).  An IEP refers to "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [20 U.S.C. § 1414(d)]."  20 U.S.C. § 1401(14).  Stated simply, an IEP is "a document that describes the child's unique needs and the state's plan for meeting those needs."  *R.F. by & through*

---

[1] For the reasons discussed more fully below, the court affords due weight to the Administrative Law Judge's ("ALJ") factual findings and credibility determinations from the underlying administrative hearing and considers them *prima facie* correct.  *See G.M. by E.P. v. Barnes*, 114 F.4th 323, 334 (4th Cir. 2024).  The facts here thus largely mirror those in the ALJ's Administrative Hearing Decision ("AHD").

*E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019). It is a "comprehensive plan prepared by a child's 'IEP Team,'" which is composed of the child's parents, teachers, and school officials. *Endrew*, 580 U.S. at 391; 20 U.S.C. § 1414(d)(1)(B). An IEP includes a host of information, including, *inter alia*, the child's "present levels of academic achievement and functional performance," "measurable annual goals," "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." 20 U.S.C. § 1414(d)(1)(A)(i)(I), (II), (IV).

In addition to the substantive right to a FAPE, "the IDEA guarantees certain procedural rights, including," *inter alia*, "the rights of parents to 'participate in meetings' regarding the identification, evaluation, and placement of their child." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 330 (4th Cir. 2024) (quoting 20 U.S.C. § 1415(b)).

### B. About A.V. and his Educational History

A.V. is around 14 years old and a resident of Carroll County. (AHD ¶¶ 1–2.) A.V. was adopted by his parents from Korea when he was 17 months old.[2] *Id.* ¶ 3. A.V. attended Manchester Elementary School ("Manchester"), a school within CCPS, for kindergarten and first grade. *Id.* ¶ 4. Of import here, in or around 2017, A.V. began seeing Dr. Steven Della Vecchia for weekly sessions of cognitive behavioral therapy. (AHD Tr. Vol. 1 at 37:16–38.:7.)

During A.V.'s first grade year, in 2018, licensed psychologist Dr. Wendy Sulc conducted a neuropsychological examination on A.V. (AHD ¶ 5.) Dr. Sulc found that A.V. met the criteria for Attention Deficit Hyperactivity Disorder/Combined Type ("ADHD/C") and Tic Disorder. *Id.*

---

[2] The parties present argument over Plaintiffs' inclusion of articles and websites regarding adoption and trauma. Such references are not material to the court's opinion and so the court declines to address the parties' arguments as to same.

¶¶ 14–15. The evaluation suggests A.V. is what is referred to as "Twice Exceptional," meaning he exhibits characteristics of being gifted based on, for example, his high verbal reasoning, and that he has co-occurring conditions, for example, his ADHD/C, "that may mask or impede his ability to fully express giftedness." *Id.* ¶¶ 10–12. Dr. Sulc's evaluation included, *inter alia*, the following recommendations: an IEP or Section 504 Plan,[3] a "high level of individual support for [A.V.'s] own safety and that of his peers," "a high degree of structure and routine, multi-modal/multi-sensory activities, and small group and one-on-one work with a teacher or paraeducator," "school-based instruction related to social problem solving and coping skills," and "behavioral interventions." *Id.* ¶ 17. Based on Dr. Sulc's diagnoses, in May 2021, CCPS determined that A.V. met the criteria for an educational disability. *Id.* ¶ 20.

CCPS developed a Functional Behavioral Assessment ("FBA") for A.V. on May 15, 2017; it was subsequently updated on November 11, 2021. (AHD ¶ 23.) At the time of his November 2021 updated FBA, A.V.'s behavior "continued to significantly impact his own safety and that of others, his personal learning, and the learning environment of others, as well as his social relationships." *Id.* "His behaviors increased in physicality," with 40 referrals in the 2019-2020 school year and 33 referrals in the 2021-2022 school year. *Id.* Referrals are "notes sent home reflecting significant rule violations." *Id.* ¶ 8.

Similarly, CCPS first developed a Behavioral Invention Plan ("BIP") for A.V. on June 13, 2018; it was subsequently revised on June 5, 2020, November 12, 2021, and April 27, 2022. (AHD ¶ 24.) A.V. attended Manchester until the Spring of 2021. *Id.* ¶ 4. He then transferred to Spring

---

[3] Section 504 is a provision of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*., that prohibits discrimination against individuals with disabilities in any program or activity receiving federal financial assistance. A Section 504 Plan outlines accommodations to be made to benefit a qualifying individual; in the education context, a Section 504 Plan requires a school to provide accommodations and modifications to an eligible student to ensure his equal access to the curriculum and school activities.

Garden Elementary School ("Spring Garden") for fifth grade. *Id.* His November 2021 revised BIP while at Spring Gardens provided that restraint and/or seclusion may be required when A.V. "escalated to the point where is a danger to himself or others." *Id.* ¶ 27. C.V. and E.V. did not consent to the use of restraint. *Id.* During the 2021-2022 school year, A.V. was subject to restraint at Spring Garden on two occasions. *Id.* ¶ 22.

In February 2022, following an IEP team meeting on February 2, 2022, A.V. began attending the Behavioral Education Support Team ("BEST") Program at Robert Moton Elementary School ("Moton"), with C.V. and E.V.'s agreement. (AHD ¶¶ 28, 46, 48–49; ECF No. 27 at p. 14; ECF No. 301 at p. 3; Feb. 2, 2022, IEP, CCPS Ex. 9 at p. 38.) A.V. only attended 12 days of school at BEST between February 28 and April 1, 2022. (AHD ¶ 51.) Ultimately, A.V. "was not successful at the BEST Program." *Id.* ¶ 59. Dr. Vecchia provided a letter for C.V. and E.V. on behalf of A.V. (*Id.* ¶ 52; Della Vecchia Letter, Pls. Ex. 15), which noted that "using any restraints/hands-on techniques or use of seclusion will be harmful to [A.V.] as well as detrimental to his rapport with school staff" and recommended that such practices be avoided. (AHD ¶ 52.)

As discussed at greater length below, C.V. and E.V. unilaterally enrolled A.V. in Fusion Academy ("Fusion") for the 2022-2023 and 2023-2024 school years. (AHD ¶¶ 106, 108–109, 146–49, 176.)

### C.  The 2022-2023 School Year

Following A.V.'s lack of success at BEST, an IEP team meeting was convened on April 27, 2022, to develop A.V.'s IEP for the 2022-2023 school year. (AHD ¶¶ 62, 70.) In advance of the meeting, on March 4, 2022, Dr. Sulc conducted a second evaluation of A.V. at the request of his parents. *Id.* ¶ 53. Dr. Sulc found that A.V. "needs significantly differentiated instructional strategies, multiple services and accommodations, as well as supports and interventions tailored to

his multiple, unique neurocognitive challenges." *Id.* ¶ 55. She recommended that he receive occupational therapy, a social skills curriculum, creative and flexible approaches to obtain his cooperation, frequent work with a mental health professional, and that, "whenever possible," "he be in a classroom with a 'small group and one-on-one with a teacher or skilled paraeducator," near "peer models who have a good attention span and task focus." *Id.* ¶ 55–56. At the April 2022 IEP meeting, Dr. Sulc orally shared information from her second evaluation. *Id.* ¶ 64.

The IEP team then approved a revised version of A.V.'s IEP, which provided:

> [A.V.] displays difficulty with impulsivity, executive functioning skills, emotional regulation, shifting from one activity to another, sustaining effort through an undesirable activity, and maintaining his attention. [He] appears to also have a heightened awareness. The IEP has provided substantial amounts of special education services to support [his] social emotional behavioral development, however, [he] has not made progress toward his IEP objectives. [Occupational therapy ("OT")] services were added based on an outside OT report shared with the team on 2/02/2022.

(AHD ¶ 69; Apr. 27, 2022 IEP, CCPS Ex. 16.) In revising A.V.'s BIP at this same meeting, CCPS found that A.V. had "engaged in physical contact, threats, and elopement that interfered with his learning;" the referenced physical contact and threats included kicking, hitting, pushing, chasing, and grabbing adults; bumping and pushing his peers; and threatening to stab staff with a pencil. *Id.* ¶ 28.

The April 2022 IEP set forth the following goals:

> Goal No. 1 (Social Emotional/Behavioral) was that when the Student expresses frustration or appears to be dysregulated, and an adult models a practice coping strategy (*e.g.* deep breathing, movement break) he will imitate or "join in" using the strategy, with the adult, on 80% or randomized behavior observations across a month interval. This goal was accompanied by two objectives: Objective 1 was that "[w]hile in a regulated state (*e.g.* during counseling sessions, engaging in preferred activities, completing more preferred academic tasks) and with adult support and modeling, [he] will imitate or 'join in' coping strategies on 3 out of

4 opportunities.["] Objective 2 was that "[w]hile in a dysregulated state (*e.g.*, while completing a less preferred task, engaging in a less preferred activity, challenging social situation), and with adult support and modeling, [he] imitate[s] or 'join[s] in' coping strategies on 2 out of 4 opportunities."

Goal No. 2 (Social Emotional/Behavioral[)] was that given counseling sessions and adult support with guidance, the Student will be able to participate successfully in counseling sessions as evidenced by him being able to complete the therapist task to learn in 2 out of 4 weekly sessions for one month. Goal No. 2 was accompanied by three objectives: Objective 1 was that he will be available to participate in the interoception curriculum in weekly session with OT in 3 out of 4 sessions. Objective 2 was that given consistent limits and guidance, he will be able to follow the guidelines in the therapy session to remain safe and follow directions in 4 out of 4 sessions. Objective 3 was that given counseling sessions, he will begin to work on decreasing his impulsive behavior and learn to delay his needs, by practicing during sessions in 2 out of 4 sessions.

Goal No. 3 was that during a situation that might be challenging or frustrating, the Student will verbally or nonverbally (i.e. using a visual, gesture) communicate to an adult, with guidance and support as needed, that he is experiencing signs/cues of dysregulation, in 80% of randomized behavior observations. This goal was accompanied by four objectives. Objective 1 was that the Student will identify physiological cures (e.g., tense muscles, heart racing) that are early warning signs of increased frustration, during 3 out of 4 counselling sessions. Objective 2 [w]as that the Student will identify behavioral cues (e.g., pacing, fidgeting) that are early warning signs of increased frustration, during 3 out of 4 counselling sessions. Objective 3 was that he will identify emotional cues (e.g., scared, frustration) that are early warning signs of increased frustration, during 3 out of 4 counselling sessions. Objective 4 was that he will identify thought patterns (e.g., stuck on one idea, racing thoughts) that are early warning signs of increased frustration, during 3 out of 4 counselling sessions.

Goal No. 4 was that given two or fewer prompts, scheduled reward breaks & reminders to use break cards, the Student will stay in assigned location as evidenced by a 25% increase from baseline per month as measured by point sheet data. Baseline to be determined within the first 2 weeks of implementation of the goal. This goal was accompanied by three objectives. Objective 1 was that when given a reminder of his assigned location, the Student will follow teacher

directions within 2 prompts for an average of at least 60% of the time across a two-week period, evidenced by teacher observations and point sheets. Objective 2 was that given a 1 minute warning prior to a transition, the Student will transition to the appropriate location within 2-minutes of the prompt, for an average of at least 60% of the time based on point sheet data. Objective 3 is that given structured breaks and reminders of the appropriate time to engage in preferred tasks, the Student will complete at least 60% of the graded classwork assignments in the core content areas (math, ELA, science, social studies[]).

Goal No. 5 was that given oral rehearsal, the Student will complete a 3-step task within the classroom setting with no more than minimal verbal cues/assistance as evidenced by completing the task in 4/5 trials per month. This goal was accompanied by four objectives. Objective 1 was that the Student will take a 3-step task, and articulate what to do first, next, and last, in order to complete the task, with no more than minimal verbal cues, in 4/5 trials. Objective 2 was that he will identify strategies, people, and classroom tools needed to help him complete all 3 stages of the task, in the proper sequence, with no more than minimal verbal cues, in 4/5 trials. Objective 3 was that he will perform a 3-part task, with a successful outcome, with no more than minimal verbal cues, within small group in 4/5 trials. Objective 4 was that he will perform a 3-party task, with. a successful outcome, with no more than minimal verbal cues, in the classroom setting, in 2/5 trials.

(AHD ¶ 71.)  Restraint and seclusion were not included in A.V.'s IEP.  *Id.* ¶ 78

The April 2022 IEP provided for special education services as follows:

[T]hirty hours and ten minutes of classroom instruction monthly by a special education classroom education outside general education; two twenty minute OT therapy sessions weekly, outside general education provided by an occupational therapist as primary provider or certified OT assistant; and five twenty minute counseling services provided by a mental health therapist – LCPC/LCSW-C – as the primary provider of a school social worker, psychologist, or guidance counselor.

(AHD ¶ 73.)  The rationale for specialized classroom instruction outside of the general education environment was to address A.V.'s "social emotional/behavior, self-management, and executive functioning needs."  *Id.* ¶ 74.  The OT services were included to address "his sensory processing

and executive functioning." *Id.* And the counseling services were included to address "his social/emotional needs." *Id.*

The IEP further provided that the Least Restrictive Environment ("LRE") to implement the IEP was "a private separate day school that does not house programs for nondisabled students" (*id* ¶ 75); the rationale was that A.V. "required a setting with integrated, proactive behavior support as listed in his BIP, and a therapeutic education setting that focuses/reinforces his use of behavior coping strategies." *Id.* ¶ 76. The IEP team "considered but rejected the following options: all services in a regular education setting; combination of services in regular education setting and out of regular education setting at the home school; and all services within the BEST program." *Id.* ¶ 75.

Kristin Hoffman, CCPS's coordinator of special education/nonpublic placement, provided C.V. and E.V. with five referrals to potential schools to implement A.V.'s IEP: Baltimore Lab School (at C.V and E.V.'s request), Gateway School – Hearing and Speech Agency (at C.V. and E.V.'s request), Laurel Hall – Frederick, Sheppard Pratt-Glyndon ("Shepard Pratt"), and St. Elizabeth School. (AHD ¶ 79.) Ms. Hoffman further included the criteria for identifying these schools, including that the schools, *inter alia*, are Maryland State Department of Education ("MSDE")[4] approved Type 1 Special Education schools, can provide A.V. with grade-level instruction as he is diploma-bound, can meet A.V.'s social/emotional/behavioral needs through a therapeutic environment, can provide counseling services as set forth in the IEP, can effectively implement the behavior plan, and can provide crisis counseling and crisis management. *Id.* ¶ 82.

---

[4] "The MSDE has criteria for approving a nonpublic school as a Type 1 school." (AHD ¶ 83.) "Type 1 criteria include, without limitation, that the school have documentation of all aspects of behavior management policies and procedures for exclusion, restraint, and seclusion required by COMAR 13.08.04 for schools providing special education services, ability to provide special education and related services consistent with each student's IEP, provision of IEP progress documentation to the local school system, policies and procedures for notifying the local school system if related services are not provided as specified in the IEP, that teachers hold valid Maryland certification, and that related service providers hold required licenses/certificates." *Id.*

Ms. Hoffman then sent referrals to all the aforementioned schools, despite C.V. and E.V. not consenting to referrals to St. Elizabeth, Laurel Hall, and Sheppard Pratt.  (AHD ¶¶ 88–89.)  Of the referrals, the only placement C.V and E.V. would have accepted was the Baltimore Lab School. *Id.* ¶ 92.  None of the schools accepted A.V. for admission.  *Id.* ¶¶ 92–96.  Ms. Hoffman then sent referrals to the Arrow Center for Education at Cromwell Ridge ("Arrow"), Kennedy Krieger Fairmont ("Kennedy Krieger"), and High Road.  *Id.* ¶ 98.  Due to distance, Arrow and Kennedy Krieger were prioritized over High Road.  *Id.* ¶ 99.

Kennedy Krieger advised of an available spot.  (AHD ¶ 100.)  C.V. then "asked for a commitment that 'under **NO CIRCUMSTANCES**' will anyone at Kennedy Krieger ever use restraint or seclusion."  *Id.* (emphasis and capitalization in original).  Brooke Shivers of Kennedy Krieger responded that restraint and seclusion are only used where "there is an imminent safety risk to the students and staff."  *Id.* ¶ 101.  She further detailed the process that would be followed were seclusion or restraint to be used, *e.g.*, calling an IEP meeting "to problem solve and debrief the incident." *Id.*  She wrote: "[T]here is no guarantee that a situation might not arise that would require us to use a more restrictive intervention to maintain safety, but as noted above it would only be implemented as a last resort."  *Id.*  For the 2021-2022 and 2022-2023 school years, Kennedy Krieger reported 400 and 145 incidents of seclusion, respectively.  (Physical Restraint and Seclusion Reports, CCPS Ex. 55 at pp. 11, 20.)

Arrow accepted A.V., but C.V. and E.V. ultimately rejected the placement.  (AHD ¶¶ 103–104.)  C.V. and E.V. asked Arrow for confirmation that it would not under any circumstances use restraint or seclusion on A.V.  *Id.* ¶ 104.  Arrow responded that because restraint and seclusion were not included on A.V.'s IEP, those methods would only be employed as a last resort "in situations of continuous acts of physical aggression, self-injurious behavior, and/or high magnitude

disruption." *Id.*  If such a situation arose, Arrow advised, Arrow would contact CCPS, C.V. and E.V. to request an IEP within 10 days "to discuss the event, potential harmful effects, and possible amendment of the IEP." *Id.*  For the 2021-2022 and 2022-2023 school years, Arrow reported 11 and 60 instances of restraint, respectively, as well as 11 incidents of seclusion in the 2022-2023 school year. (Physical Restraint and Seclusion Reports, CCPS Ex. 55 at pp. 2, 15, 19.)

C.V. and E.V. ultimately applied to Fusion in Columbia, Maryland.  (AHD ¶ 106.)  A.V. was admitted to Fusion in August 2022. *Id.*  C.V. and E.V. notified CCPS that they had unilaterally placed A.V. at Fusion on September 15, 2022. *Id.* ¶ 108.  On September 27, 2022, CCPS's counsel noted that CCPS has secured a location for A.V.'s FAPE (Arrow), and advised that CCPS had rejected C.V. and E.V.'s request for funding and reimbursement because it did not believe Fusion was capable of implementing A.V.'s IEP in the LRE, because Fusion was not a State-approved Type 1 program, it lacked related service providers, it did not offer direct counseling services, and it only provided direct instruction in a one-to-one setting,. *Id.*

A.V. began attending Fusion on October 6, 2022, in non-credit tutor mentoring sessions. (AHD ¶ 109.)  Fusion is not accredited by MSDE, but is by Cognia, a private accreditation entity. *Id.* ¶ 114.  Fusion is a school for children in grades six through 12; and "[t]he class size is always one teacher to one student." *Id.*  "Some Fusion teachers are certified." *Id.*  "The majority of Fusion students are neurodiverse, with ADHD, autism spectrum disorder, obsessive compulsive disorder, anxiety, depression, or bipolar disorder." *Id.*  A.V. had access to other students at Fusion in the "homework café," where, during 2022-2023 school year, he spent a maximum of ten minutes per day. *Id.* ¶¶ 116–17.  Fusion does not have a school psychologist, an occupational therapist, a social worker, or a Board-Certified Behavior Analyst, nor does it provide access to crisis counseling. *Id.*

¶¶ 123–26, 138.  While at Fusion, A.V., as of the AHD, did not physically attack anyone or elope from campus; and there were no complaints that A.V. made others feel threatened.  *Id.* ¶¶ 127–29.

### D.  The 2023-2024 School Year

A.V.'s April 2022 IEP expired on April 26, 2023.  (Apr. 27, 2022, IEP, CCPS Ex. 16 at p. 38.)  On July 14, 2023, CCPS provided a written notice and invitation to C.V. and E.V. to participate in an IEP team meeting on August 14, 2023.  (AHD ¶ 150.)  Prior to that, on July 8, 2023, C.V. electronically signed an Enrollment Contract with Fusion for A.V.'s 2023-2024 school year.  *Id.* ¶ 146.  As part of the Enrollment Contract, C.V. was required to pay a registration fee of $1,500.00.  *Id.*  On July 2, 2023, C.V. also executed a Fusion Enrollment Contract Supplement, which required payment of $311.51 as an Installment Convenience Fee in consideration for Fusion allowing deferred tuition payments to be made in installments.  *Id.* ¶ 147.  These fees were non-refundable.  *Id.* ¶ 148.  Fusion's "total tuition cost for the 2023-2024 school year would be $94,776.00."  *Id.* at ¶ 147.

In preparation for the IEP team meeting set for August 14, 2023, CCPS requested that C.V. and E.V. signed consent forms authorizing Fusion to provide A.V.'s records, and allowing CCPS to observe A.V. at Fusion.  (AHD ¶¶ 151–52.)  They signed the requested forms.  CCPS also spoke with Fusion's campus director about A.V.'s participation.  *Id.* ¶ 153.  The IEP team meeting began on August 14, 2023 and continued to August 22, 2023.  *Id.* ¶ 154.  In attendance were, *inter alia*, C.V. and E.V., C.V. and E.V.'s attorney and educational consultant, Fusion's Campus Director, Ms. Hoffman, CCPS special education supervisors, a CCPS occupational therapist, a CCPS school psychologist, and CCPS's attorney.  *Id.* ¶ 154.

At C.V. and E.V.'s request, the IEP team removed A.V.'s BIP because he was not presently engaging in physical contact, threats, or elopements. (AHD ¶ 155.) The IEP team also revised A.V.'s goals, including

> New Goal 1 is: Given visual or verbal cues, [A.V.] will identify when he is feeling frustrated or overwhelmed and either independently or with adult prompting state what he needs (example: break, different activity, different location) on at least 4 or 5 occasions. This goal was accompanied by four objective[s]. Objective 1 is "Given visual or verbal cues, [A.V.] will state when he is frustrated or overwhelmed in 4 out of 5 opportunities.["] Objective 2 is "Given visual or verbal cues, [A.V.] will choose a coping strategy or sensory tool to manage feelings of frustration on 4 out of 5 opportunities.["] Objective 3 is "Given visual or verbal cues, after an incident/episode of frustration, [A.V.] will talk with a trusted adult to reflect and state the possible causes to his frustration (identify trigger) in 4 out of 5 opportunities.["]

> New Goal 2 is: "Given strategies to initiate and sustain attention, [A.V.] will complete a 3 step nonpreferred or unfamiliar task with no more than minimal verbal cues/assistance as evidenced by completing the task in 4 out of 5 occasions. This goal was accompanied by three objectives. Objective 1 is "Given strategies to initiate and sustain attention, [A.V.] will articulate what to do first, next, and last in order to complete a nonpreferred or unfamiliar task with no more than minimal verbal cues in 4 out of 5 opportunities." Objective 2 is "Given strategies to initiate and sustain attention, [A.V.] identified strategies, people, and classroom tools needed to help him complete all 3 steps of the nonpreferred or unfamiliar task, in the proper sequence, with no more than minimal verbal cues in 4 out of 5 opportunities.["] Objective 3 is "Given strategies to initiate and sustain attention, [A.V.] will perform a 3-part nonpreferred or unfamiliar task with successful outcome with no more than minimal verbal cues in 4 out of 5 opportunities.["]

(AHD ¶¶ 156–57; Aug. 14, 2023 IEP, CCPS Ex. 42.)

The August 2023 IEP called for a monthly psychological consultation with staff, periodic occupational therapy consultations with staff, four 30-minute direct counseling sessions, twice weekly 20-minute direct occupational therapy sessions, 17 hours and 20 minutes per week of classroom instruction outside of general education, and specialized transportation. (AHD ¶¶ 158–

59.)  C.V. and E.V. "disagreed with the provision of psychological consult, psychological services,

occupational therapy consult, and occupational therapy services," as well as the recommended

hours for classroom instruction.  *Id.* ¶¶ 160–61.  "The IEP team again determined that the LRE

was a private, separate day school because [A.V.] requires" the following:

> [A] small, structured learning environment with a low student to
> staff ratio which cannot be provided in the general education setting,
> requires specialized instruction throughout the entire day with
> supports in initiating and sustaining attention, requires flexibility,
> requires a psychologist to consult with adults in his educational
> environment to support his social emotional needs in the classroom
> and school environment, requires an [occupational therapist] to
> consult with adults in the school environment, requires counseling
> services to address his social emotional/self-management goals, and
> requires occupational therapy services to develop sensory coping
> skills.

*Id.* ¶ 162.  C.V. and E.V. proposed A.V. attend Fusion at the meeting.  *Id.* ¶ 163.

  In determining referrals for the 2023-2024 school year, CCPS considered placements that

were MSDE Type 1 special education schools and able to implement A.V.'s IEP.  (AHD ¶ 164.)

The referrals identified were Kennedy Krieger, Sheppard Pratt, and Pathways.  *Id.*  Pathways was

added because A.V. was by then in middle school and based on C.V. and E.V.'s "advocacy for a

one-to-one educational program" and one that was restraint and seclusion free.  *Id.*  Pathways

"endorses itself as 'restraint and seclusion free.'"  *Id.*  At the meeting, C.V. and E.V. "indicated

they were not willing to consider Sheppard Pratt or Kennedy Krieger schools unless those schools

changed their restraint and seclusion policy."  *Id.*  ¶ 174.  C.V. and E.V. similarly "did not consider

Pathways as an appropriate placement because they considered Fusion as [A.V.'s] only appropriate

placement."[5]  *Id.* ¶ 175.

---

[5] To the extent Plaintiffs contend this finding of fact was in error, the court declines to deviate from the ALJ's findings for reasons discussed at greater length below.

On September 25, 2023, Ms. Hoffman provided C.V. and E.V. a copy of the August 2023 IEP in draft format with the explanation that it could not be finalized without a specific placement. (AHD ¶ 167.)  She also advised them that she had sent the three referrals for placement.  *Id.* ¶ 169. No school responded to the referral.  *Id.*  Ms. Hoffman did not follow up with the three schools or send any additional referrals.  *Id.* ¶ 171, 173.  Ms. Hoffman did not tell C.V. or E.V. that A.V. had not been accepted (or rejected) at any of the schools.  *Id.* ¶ 170.  Fusion was the only school that accepted A.V. for the 2023-2024 school year.  *Id.* ¶ 176.

### E.  Due Process Complaint

On January 31, 2024, C.V. and E.V. filed a Due Process Complaint on behalf of A.V. with the Maryland Office of Administrative Hearings ("OAH"), alleging that CCPS substantively violated the IDEA by denying A.V. a FAPE for the 2022-2023 and 2023-2024 school years, and procedurally violated the IDEA in their development of A.V.'s August 2023 IEP.  (AHD at pp. 1–2.)  The Due Process Complaint was amended on April 1, 2025.  *Id.* at p. 5.  They requested an administrative hearing and sought reimbursement of all costs for A.V.'s placement at Fusion for the 2022-2023 and 2023-2024 school years.  A nine-day hearing was convened from May 6 through May 22, 2024.  *Id.* at p. 7.  C.V. and E.V. offered seven witnesses at the hearing; CCPS offered six.  *Id.* at pp. 9–10.  The parties stipulated to the following:

> There is no record that [A.V.] informed the school team that [he] gets traumatized by seeing or hearing other students being restrained or secluded.

> There is no documentation that specifically states that [A.V.] is retraumatized by witnessing others be restrained or secluded.

*Id.* at p. 10.  Further, the ALJ recognized that "the parties stipulated that there is no record of [C.V. and E.V.] having informed the CCPS of their concern about third-party or vicarious trauma" related to restraint and seclusion.  *Id.* at p. 105.

15

ALJ Robert B. Levin issued his 133-page decision on June 21, 2024. His decision addressed, relevant here, the following: whether A.V. had been denied a FAPE for the 2022-2023 and 2023-2024 school years; whether CCPS procedurally failed to comply with the IDEA by failing to offer a placement to A.V. for a FAPE for the 2022-2023 school year; and whether A.V. received appropriate education benefit from Fusion for the 2022-2023 and 2023-2024 school years. (AHD at p. 8.)  Ultimately, ALJ Levin concluded, again relevant here, that A.V. was not denied a FAPE for either the 2022-2023 or 2023-2024 school year; that CCPS's procedural violation in failing to follow up about placement for the 2023-2024 school year did not result in denial of a FAPE or loss of educational opportunity for A.V.; and that, based on the foregoing, C.V. and E.V. were not entitled to reimbursement for Fusion.  *Id.* at pp. 126, 129–132.

### F.  The Instant Action

On August 30, 2024, Plaintiffs initiated this action against Defendants.  Plaintiffs seek review of the ALJ's decisions pursuant to the IDEA, and contend the ALJ erred in his conclusions. (ECF No. 1 ¶¶ 127-30; the "Complaint.")  Plaintiffs and Defendants now seek summary judgment. (ECF Nos. 26, 30.)

## II.    STANDARD OF REVIEW

"An action filed in federal district court pursuant to the IDEA 'is an original civil action, not an appeal from a state administrative agency.'" *Charlotte-Mecklenburg Cnty. Bd. of Educ. v. Brady*, 66 F.4th 205, 211 (4th Cir. 2023) (quoting *Johnson v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 20 F.4th 835, 844 (4th Cir. 2021)).  The court "cannot affirm, reverse, vacate, or remand the state hearing officer's decision." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 330 (4th Cir. 2024) (citing *Johnson*, 20 F.4th at 845–46).  Instead, it "conducts an independent review, deferring to the hearing officer's 'regularly made' factual findings and ordering substantive or procedural relief as

necessary." *G.M.*, 114 F.4th at 330 (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)).

The court "is obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (first citing *Board of Educ. v. Rowley,* 458 U.S. 176, 206 (1982); then citing *Doyle,* 953 F.2d at 103). To afford such "due weight," the court "treat[s] the state hearing officer's factual findings and credibility determinations as '*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding,' so long as the findings were 'regularly made.'" *G.M.*, 114 F.4th at 334 (quoting *Doyle*, 953 F.2d at 105). In contrast, "when an ALJ has strayed 'so far from the accepted norm of a fact-finding process' that its findings were not 'regularly made,'" the ALJ's findings are not entitled to deference. *Bouabid v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023) (quoting *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008)). Where the court deviates from the ALJ's fact-findings, it is "required to explain why." *Doyle*, 953 F.2d at 105.

"After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute." *Doyle*, 953 F.2d at 105. This court makes the "ultimate decision as to whether the state has complied with the IDEA." *R.F.*, 919 F.3d at 245 (citing *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011)). "In making this independent decision, courts should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). Plaintiffs as the party seeking relief under the IDEA bear the burden

of proof. *G.M.*, 114 F.4th at 334 (citing *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)).

The IDEA standard "works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases." *A.H. v. Smith*, 367 F. Supp. 3d 387, 411 (D. Md. 2019) (quoting *M.C.*, 2014 WL 7404576, at *7). Accordingly, summary judgment is proper where the moving party, relying upon citations "to particular parts of materials in the record," demonstrates "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that a party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive"). In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). But, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC,* 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson,* 477 U.S. at 252).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment

as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In so doing, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (citations omitted); *see Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2021) (same).

## III.    ANALYSIS

As discussed above, Plaintiffs urge that the ALJ erred in determining that CCPS offered A.V. a FAPE for the 2022-2023 and 2023-2024 school years, and that C.V. and E.V. are not entitled to reimbursement for tuition and expenses for their unilateral placement of A.V. at Fusion. (ECF No. 26-1 at p. 6; ECF No. 1 ¶¶ 128–30.) It their Motion, Defendants argue the opposite: that the ALJ's determinations were not erroneous and should be upheld. (ECF No. 30-1 at pp. 15–16.)

### A. Weight Afforded to the ALJ's Findings of Fact

The parties are in agreement that the ALJ's findings were regularly made. (ECF No. 27 at p. 23; ECF No. 30-1 at p. 16.) The court agrees. Whether an ALJ's findings were regularly made is determined by looking at the "*process* through which the findings were made," as opposed to the result of that same process. *G.M. by E.P. v. Barnes*, 114 F.4th 323, 334 (4th Cir. 2024) (emphasis in original) (quoting *Bouabid v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023)). The Fourth Circuit has held that an administrative hearing officer's findings are regularly made where he "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the [hearing officer] by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008); *G.M.*, 114 F.4th at 334 (same).

The ALJ here convened a nine-day hearing during which both sides advanced argument, put on witnesses, and offered evidence. The ALJ subsequently issued a thorough and comprehensive 133-page decision, with 176 findings of fact, analysis, and, ultimately, his conclusions of law. As the parties rightly observe, "[t]his process was well within the accepted norm of a fact-finding process." *G.M.*, 114 F.4th at 334–35. The court may therefore consider the ALJ's findings of fact as *prima facie* correct in conducting its review of the cross-motions. *Id.*

### B. Deference Afforded to School Officials

"IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent." *Id.* at 334 (quoting *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004)). As such, the court's consideration of whether a school has provided a FAPE is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403–404 (2017) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)). When assessing whether the party seeking relief under the IDEA has met its burden, courts are not "entitled to 'substitute their own notions of sound educational policy for those of local school authorities.'" *G.M.*, 114 F.4th at 334 (quoting *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997)).

Such deference, however, is not without limit. The degree of deference is "based on the application of expertise and the exercise of judgment by school authorities." *Endrew*, 580 U.S. at 404. A reviewing court expects such authorities "to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.*

### C.  FAPE

As discussed above, the IDEA "guarantees a substantively adequate program of education to all eligible children."  *Endrew*, 580 U.S. at 394 (citing *Rowley*, 458 U.S. at 200–202).  The substantive requirements of the IDEA are met where the school provides a child with a FAPE. *R.F. by & through E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 245 (4th Cir. 2019) (citing *M.L. ex rel. Leiman v. Smith*, 867 F.3d 487, 499 (4th Cir. 2017)).  Ultimately, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew*, 580 U.S. at 399.  The analysis is grounded in "the unique circumstances of the child."  *Id.* at 404.  "Courts conduct this analysis with an understanding that 'crafting an appropriate program of education requires a prospective judgment by school officials.'"  *R.F.*, 919 F.3d at 250 (quoting *Endrew*, 580 U.S. at 399.)  With respect to educational placement for children with disabilities, the placements should be made by a group of persons knowledgeable about the child and based on the child's IEP.  34 C.F.R. §§ 300.116(a)(1), (b)(2).

#### 1.  The 2022-2023 FAPE

As discussed above, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew*, 580 U.S. at 399.  This results from a "fact-intensive exercise . . . informed not only by the expertise of school officials, but also by the input of the child's parents." *Id.*

The IEP team meeting of April 27, 2022, included school officials, C.V. and E.V., C.V. and E.V.'s educational consultant (Richotte), A.V.'s private therapist (Vecchia), A.V.'s psychologist who conducted his psychoeducation evaluations (Sulc), and their attorney.  *See* 20

U.S.C. § 1414(d)(1)(B). As the ALJ noted, CCPS presented evidence that the IEP team considered A.V.'s strengths and experience, the recommendations of C.V. and E.V. and their representatives regarding enhancing A.V.'s education, the occupational therapy evaluation, the impact of his behavior on his learning, as well as "his academic, developmental, and functional needs and goals." (AHD at p. 103.) *See* 20 U.S.C. § 1414(d)(1)(A)(i) (defining IEP and describing its required content and considerations). Based on these considerations, the IEP set goals and objectives uniquely tailored to A.V.'s circumstances. (AHD ¶ 71.) *See* 20 U.S.C. § 1414(d)(1)(A)(i). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Endrew*, 580 U.S. at 399.

Plaintiffs assert the April 2022 IEP failed to provide A.V. a FAPE for two reasons: (a) the IEP failed to account for the trauma of restraint and seclusion; and (b) it failed to provide education in the least restrictive environment. The court disagrees. Based on the above-cited authorities, and for the reasons discussed below, the court concludes that ALJ Levin did not err in concluding that the April 2022 IEP was "reasonably calculated to enable [A.V.] to make progress appropriate in light of [his] circumstances" and to provide him with a FAPE. *See Endrew*, 580 U.S. at 399, *supra*; AHD at p. 102.

a.  Restraint and Seclusion

Plaintiffs argue the ALJ erred in finding that CCPS offered A.V. a FAPE for the 2022-2023 school year because he failed "to give due weight to the potential harm of placing him in a school that employed restraint and seclusion." (ECF No. 26-1 at p. 25.) By way of background, in Maryland, "physical restraint" refers to "a personal restriction that immobilizes a student or reduces the ability of a student to move their torso, arms, legs, or head freely that occurs during school hours." MD. CODE ANN., EDUC. § 7-1101(d)(1). "Seclusion" refers to "the confinement of

a student alone in a room, an enclosure, or any other space from which the student is physically prevented from leaving during school hours." *Id.* § 7-1101(f)(1).  A nonpublic school may not invoke physical restraint or seclusion of a student as a behavioral health intervention unless it is "necessary to protect the student or another individual from imminent serious physical harm," and "[o]ther, less intrusive, nonphysical interventions have failed or been demonstrated to be inappropriate for the student."[6] *Id.* § 7-1102(c), (d).

The undisputed record before the ALJ and this court is that restraint and seclusion are not a positive behavioral intervention for A.V.  To that end, the April 2022 IEP team did not include the use of such practices in A.V.'s IEP.  As ALJ Levin recognized: "The Parents' abiding concerns regarding restraint and seclusion deserve to be taken seriously.  But restraint and seclusion are not even included in [A.V.'s] IEP as techniques to be used, and the law only allows these techniques to be used as a last resort to protect [A.V.] or others from imminent harm."  (AHD at pp. 105–106.)  The record before the ALJ was that the April 2022 IEP team considered the appropriate placement to implement A.V.'s IEP, which did not include restraint or seclusion; it identified referrals to private schools that could implement A.V.'s IEP and provide necessary services to do so, including counseling, occupational therapy, and small group instruction.  That referrals were made to some schools that did not, as a policy, ban restraint and seclusion in all instances does not change the fact that A.V.'s IEP did not call for restraint and seclusion.

Plaintiffs take the position that CCPS should not have made referrals to schools whose policies allow for restraint and seclusion where permitted by the law cited above.  Stated differently, Plaintiffs assert that because restraint and seclusion were not in A.V.'s IEP, schools

---

[6] The provision also provides for additional requirements for use of seclusion.  MD. CODE ANN., EDUC. § 7-1102(d)(iii)–(vi).

that did not have a policy absolutely barring such practice should not have been considered. CCPS, however, presents evidence that it considered the programs that could implement A.V.'s April 2022 IEP, as discussed above, including the goals, objectives, and services the IEP required be provided to A.V. The record shows that the referrals CCPS pursued were those it believed could implement same. Plaintiffs' insistence that CCPS improperly failed to refer A.V. to Fusion focuses entirely on its policy on restraint and seclusion—practices not called for in A.V.'s IEP—and ignores the wealth of IEP components Fusion was unable to meet or implement.

Further, the undisputed record evidence is that Plaintiffs rejected placement for A.V. at Arrow and Kennedy Krieger—schools poised to implement A.V.'s IEP based on those schools' failure to assure them that restraint and/or seclusion would not be used under any circumstances. (AHD ¶¶ 100, 104.)[7]

ALJ Levin correctly noted:

> The requested guaranty would have put the schools in the position of either standing by and doing nothing in a situation involving imminent harm, or summoning armed police officers or emergency medical personnel for assistance. These unsatisfactory and unsafe alternatives would result in either a delayed response to an imminent risk, or a potentially even more traumatic response by armed police officer, as compared to restraint by a trained professional in a therapeutic school environment.

*Id.* at p. 106.

While Plaintiffs assert this is speculation unsupported by the preponderance of the evidence, the court disagrees. The ALJ's conclusion considered the wealth of evidence before him and weighed it accordingly. The court appreciates that Plaintiffs believe that, based on his experience at Fusion, A.V. does not pose a risk of harm to himself or others where is he not subject

---

[7] The reader will recall that Arrow accepted A.V. and Kennedy Krieger had an opening C.V. and E.V. declined to pursue.

to restraint or seclusion, but such circular logic does not persuade the court that CCPS's refusal to include Fusion as a placement was unreasonable. The responses from Arrow and Kennedy Krieger, and most importantly, the law, make clear that A.V. would not have been subject to restraint or seclusion absent the acute, imperative circumstances reflected in the schools' policies and MD. CODE ANN., EDUC. §§ 7-1101, 1102, noted above; and, again, restraint and seclusion were not set forth in the April 2022 IEP. Plaintiffs did not present and the ALJ identified no evidence to suggest that A.V. would be subject to restraint or seclusion absent such an imminent threat of harm to himself or others. While Plaintiffs speculate that private schools may not follow their own policies, extension of this logic to its natural conclusion allows that Fusion, too, is subject to such a failure with regard to its policy against restraint and seclusion. In any event, speculation alone is insufficient to meet their burden here.

Further, to the extent Plaintiffs argue the ALJ failed to weigh properly that A.V. would be retraumatized by seeing other students subject to such practices, the court disagrees. The ALJ considered these facts, and relying on the stipulations of the parties, did not find it persuasive. There was no record evidence of documentation of that concern brought to CCPS. (AHD at pp. 10, 105.) That CCPS's school psychologist acknowledged that a person can reexperience trauma by witnessing the triggering event happen to someone else does not persuade the court that concerns about retraumatization were brought to CCPS or that the ALJ erred. The record before the ALJ supports his assessment of same.

As discussed above, based on the ALJ's *prima facie* correct findings of fact, and the undisputed record evidence before the court, the court agrees with the ALJ and concludes that A.V.'s IEP was "reasonably calculated to enable [him] to make progress appropriate in light of the [his] circumstances," where it did not call for the use of restraint or seclusion. *See Endrew*, 580

25

U.S. at 399.  *See G.M. by E.P. v. Barnes*, 114 F.4th 323, 342 (4th Cir. 2024) (describing that a "FAPE entails 'an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," but "[i]t is not synonymous with 'the best possible education'") (first quoting *Endrew*, 580 U.S. at 399; next quoting *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 526 (4th Cir. 2002)).  Accordingly, CCPS did not fail to provide A.V. with a FAPE for the 2022-2023 school year based upon the referrals it made.

   b.  Least Restrictive Environment

   Plaintiffs also argue ALJ Levin erred in finding that A.V.'s April 2022 IEP provided a placement in the least restrictive environment.  In particular, Plaintiffs argue the placements CCPS considered, specifically Arrow and Kennedy Krieger, were "completely segregated programs with no opportunities to interact with non-disabled peers," whereas Fusion was "less restrictive."  (ECF No. 27 at p. 35.)

   The IDEA requires children with disabilities to be educated in the Least Restrictive Environment ("LRE"), meaning, "[t]o the maximum extent possible," they be "educated with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).  Children with disabilities may only be removed from the regular educational environment where "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  *Id.*  "Mainstreaming" children with disabilities into the regular education environment, with potential "to study and socialize" with children who are not disabled, "is not only a laudable goal but is also a requirement of the [IDEA]."  *DeVries By DeBlaay v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989).  At the same time, however, it is not always appropriate for every child.  *Id.*  "'[T]he proper inquiry is whether a proposed placement is appropriate under the [IDEA]'—in other words, whether a child's

placement—the setting where the child learns—provides the child with a FAPE." *R.F.*, 919 F.3d at 246 (quoting *DeVries*, 882 F.2d at 878).

As discussed above, the record evidence before the ALJ was that the IEP team considered A.V.'s abilities and needs. The IEP team considered five placement options that included non-segregated options. All options were rejected because they lacked other qualities that were attuned to the child's circumstances—lack of integrated behavioral/therapeutic supports, providing all instruction outside of the general education settings, and art and fitness classes. (AHD at p. 108.) The IEP team ultimately agreed, "without parental dissent," to a placement with "services to be provided in a private separate day school that does not house programs for nondisabled students." *Id.* ¶¶ 75–76, p. 108.

The court disagrees that C.V. and E.V.'s request for referral to Fusion supports their contention that they opposed the April 2022 IEP or that it demonstrates a failure to educate A.V. in the least restrictive environment possible, thus violating his right to a FAPE. As stated above, the undisputed record before the ALJ and this court is that Fusion was unable to implement A.V.'s IEP (rendering it an inappropriate referral), and that—given the competing considerations at issue—C.V. and E.V. posed no objection to A.V.'s placement in a private separate day school that does not house programs for non-disabled students.

Similarly, for these reasons, the court is unpersuaded by Plaintiff's suggestion that their request for Fusion and the fact that the summary of the IEP team meeting on April 27, 2022, does not "reflect" whether they "understood that a less restrictive placement could be an option" demonstrates that CCPS failed to offer A.V. "the least restrictive environment for him." (ECF No. 27 at p. 36.) Plaintiffs fairly ignore the totality of the undisputed record in forwarding this argument. The record shows that C.V. and E.V. attended the April 2022 IEP team meeting with

multiple representatives and/or consultants, including most notably their educational consultant and attorney—both of whom were presumably there to advise and guide them on matters relevant to the IEP to include the concept of a LRE.  Second, to the court's knowledge, "access to non-disabled peers" is neither a term of art nor a legal concept.  This is to say, the evidence does not support that C.V. and E.V.'s failure to raise this in the IEP team meeting was due to a lack of understanding or their lay status.  As discussed above, the court similarly concludes, as did ALJ Levin, that A.V.'s IEP, which called for education in a private separate day school, was reasonably calculated for him to make progress in the least restrictive environment available to him.  *See Endrew*, 580 U.S. at 399.  As such, CCPS did not fail to provide A.V. a FAPE in the LRE during the 2022-2023 school year.

### 2. *The 2023-2024 FAPE*

Finally, Plaintiffs argue that the ALJ erred in concluding that CCPS did not substantively violate the IDEA by failing to provide A.V. a FAPE for the 2023-2024 school year.  Plaintiffs argue that the August 2023 IEP was incomplete in that it failed to identify a school where services were to be provided and thus resulted in a denial of a FAPE.  Defendants urge that, as the ALJ concluded, any procedural violation did not result in the denial of a FAPE because C.V. and E.V. would not have agreed to a placement anywhere other than Fusion.

The court agrees with the ALJ, and concludes, that CCPS procedurally violated the IDEA when Ms. Hoffman failed to follow up with Pathways, Shephard Pratt, and Kennedy Krieger, and then failed to notify C.V. and E.V. that she had not received a response.  *See MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 533 (4th Cir. 2002) (explaining "[i]t is clear that, under the IDEA, the failure of a school district to have a final IEP in place at the beginning of a school year is a procedural defect").  The question, then, is the impact or result of that violation.

"The fact of a procedural IDEA violation does not necessarily entitle [Plaintiffs] to relief." *T.B.,*

*Jr. by & through T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018).

"[T]he procedural violation must have caused substantive harm." *Id.* Stated differently, the court

must determine whether the procedural violation resulted in a denial of a FAPE for A.V, or whether

it was a mere technical IDEA violation. *See id.*; *MM*, 303 F.3d at 533 (noting that "[w]hen such a

procedural defect exists, we are obliged to assess whether it resulted in the loss of an educational

opportunity for the disabled child, or whether, on the other hand, it was a mere technical

contravention of the IDEA"); *H.R.B. v. St. Mary's Cnty. Bd. of Educ.*, No. CV TJS-24-762, 2025

WL 1556067, at *11 (D. Md. May 30, 2025) (noting that, where the school failed to have an IEP

in place at the start of the school year, "the question is whether this violation deprived [the child]

of a FAPE").

As this court has recently remarked, and as the ALJ recognized here, courts do not "find

that the delay causes a loss of educational opportunity if it is clear that the parents would not have

used the IEP had it been in place at the beginning of the school year." *H.R.B.*, 2025 WL 1556067,

at *11 (citing cases). As the Fourth Circuit explained in *MM*:

> [T]he administrative decisionmakers in this case, and the district
> court as well, found that the District was willing to offer MM a
> FAPE, and that it had attempted to do so. They also found that her
> parents had a full opportunity to participate in the development of
> the Proposed 1996–97 IEP. The court's analysis emphasized that the
> parents had been afforded a full and fair involvement in the process.
> *Spielberg v. Henrico County Pub. Schs.,* 853 F.2d 256, 259 (4th
> Cir.1988). Indeed, the court properly concluded that "it would be
> improper to hold [the] School District liable for the procedural
> violation of failing to have the IEP completed and signed, when that
> failure was the result of [the parents'] lack of cooperation." Opinion
> at 15.
>
> It is significant that there is no evidence that MM's parents would
> have accepted any FAPE offered by the District that did not include
> reimbursement for the Lovaas program. As we have noted, the

> District is not obligated by the IDEA to provide a disabled child with an optimal education; it is only obliged to provide a FAPE. *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. In these circumstances, MM suffered no prejudice from the District's failure to agree to her parents' demands. Because this procedural defect did not result in any lost educational opportunity for MM, the Proposed 1996–97 IEP did not contravene the IDEA.

303 F.3d at 534–35; *see also M.K. v. Starr*, 185 F. Supp. 3d 679, 696–97 (D. Md. 2016) (agreeing with the ALJ that the school had not impeded the provision of a FAPE where the parents "had refused to cooperate in the referral process" by not following up after being contacted by referral schools).

At the same time, however, this court has also recognized that "[d]ifferent is the case where a court is asked to infer based on parents' rejection of an IEP at one point in time that they would have rejected it months earlier just the same." *M.G. v. McKnight*, 653 F. Supp. 3d 202, 215 (D. Md. 2023). Specifically, the *M.G.* court declined to make such an inference where the parents had "participated fully in the IEP process throughout, and there [was] no evidence of their intent . . . to reject any placements . . . beyond Defendants' mere speculation." *Id.*

Finally, the court recognizes that in undertaking such an inquiry, deference is due to credibility assessments and factual findings of the ALJ as the trier of fact. *T.B.*, 897 F.3d at 574.

> Faced with thorny counterfactuals, it is the duty of the fact-finder to carefully weigh the evidence to discern whether a procedural violation has in fact adversely affected a student's education. Giving due deference to such determinations recognizes that "the primary responsibility for developing IEPs belongs to state and local agencies in cooperation with the parents, not the courts." *Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256, 258 (4th Cir. 1988). It also recognizes that ALJs are typically "in a far superior position to evaluate . . . witness testimony" than are reviewing courts. *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 329 n.9 (4th Cir. 2004). Such evaluations almost inevitably rely on "various cues that . . . are lost on an appellate court later sifting through a paper record." *Cooper v. Harris*, —— U.S. ——, 137 S.Ct. 1455, 1474, 197 L.Ed.2d 837 (2017). This is in part why, throughout the federal system,

"deference to the original finder of fact" is "the rule, not the exception." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

All of this, of course, assumes that the trier of fact did a conscientious job with the case. And as shown below, the ALJ's review here was anything but cursory. Indeed, he went out of his way to exhaustively determine whether there was any scenario in which special education would have been of any assistance to T.B. within the ambit of the IDEA.

*Id.* at 574–75.

It bears noting that the undisputed record evidence shows that this is not a circumstance where CCPS failed to pursue options or failed to convene an IEP team meeting. To the contrary, it conducted such a meeting (albeit, delayed) over the course of two days and made efforts to collect recent behavior and performance information about A.V. in anticipation of the meeting. A.V.'s IEP was updated; his BIP was removed due to his improvement. The IEP team considered A.V.'s unique circumstances and included the aforementioned psychological and occupational therapy consultations, counseling and occupational therapy services, as well as "a small, structured learning environment with a low student to staff ratio which cannot be provided in the general education setting." (AHD ¶¶ 158–59, 162.) And, again, the IEP team considered the appropriate placements and sent referrals. It did not include Fusion as a potential referral because, as in the 2022-2023 school year, it could not implement A.V.'s IEP.

The ALJ's review on this question was far from cursory. The ALJ here set forth specific findings (which are prima facie correct) and his resultant analysis. He concluded:

Considering the record as a whole, I find as a fact that the Parents were so committed to continuing the Student's placement at Fusion, which they understandably considered a vast improvement over his dismal experience at the CCPS schools, that they were never open to considering Sheppard Pratt, Kennedy Krieger, Pathways, or any other school except Fusion.

(AHD at p. 124.)  The ALJ considered the evidence on both sides, including E.V.'s testimony that they would have considered Pathways, but concluded based on the record as a whole that such testimony was not persuasive.  *Id.* at p. 123–26.

Indeed, the evidence on which the ALJ based his conclusion that C.V. and E.V. would not have considered any placement beside Fusion was extensive; he did not rely upon one piece of evidence or lop-sided portions of the record.  Ms. Hoffman's testified that C.V. stated at the August 2023 IEP meeting that "Fusion was the only appropriate placement."[8]  (AHD at p. 124.)  C.V., who did not testify at the hearing due to illness, did not refute Ms. Hoffman's account.  *Id.* at pp. 124–25.  C.V. and E.V. rejected Kennedy Krieger and Sheppard Pratt because they failed to offer a guarantee against restraint or seclusion.  *Id.* at pp. 125.  This was consistent with their actions the year before to reject Kennedy Krieger and Arrow as options.  *Id.*  E.V. testified at the hearing that he could not say if they would have accepted Pathways as a placement.  *Id.* at pp. 123–25.  C.V. and E.V. did not reach out to Pathways or CCPS related to Pathways.  *Id.* at p. 125.  This inaction is particularly stark when compared to C.V. and E.V.'s contact with referrals for the April 2022 IEP.  *Id.* ¶¶ 91–93, 95, 99, 100–104, 106.  Finally, C.V. and E.V. reenrolled A.V. at Fusion for the 2023-2024 school year well before the August 2023 IEP team meeting.  That reenrollment carried with it nonrefundable costs of $1,811.51, as well as a schedule of installment payments including $15,886.76 due on July 17, 2023.[9]  *Id.* ¶¶ 146–48.

Based on the record, the court concludes Defendants did not substantively violate the IDEA through denial of a FAPE.  CCPS's above-described procedural violation did not result in denial

---

[8] Plaintiffs seemingly dispute this fact.  For the reasons set forth earlier, however, the court finds no basis to deviate from the ALJ's fact findings.  Further, the testimony was, as a practical matter, unrefuted.

[9] The court agrees with Plaintiffs that signing a reenrollment contract, alone, would be insufficient to support the conclusion that they would have rejected any placement other than Fusion.  To be sure, CCPS was delayed in proceeding with the 2023-2024 school year IEP.

of a FAPE for A.V., because C.V. and E.V. would not have considered any placement besides Fusion. The wealth of evidence and findings of fact by the ALJ, including his assessment of witness credibility, to which this court affords appropriate due deference, plainly support this conclusion. This is far from a circumstance, as in *M.G.*, where there was nothing but pure speculation to support the parents' purported intent to reject the placements. Here, there is substantial evidence that any placement other than Fusion would not have been acceptable. *See MM*, 303 F.3d at 535, *supra*.

Briefly, Plaintiffs contend there is no evidence that they did not "make a *bona fide* effort" to participate in the development of A.V.'s IEP, citing *Sarah M. v. Weast*, 111 F. Supp. 2d 695, 701 n.6 (D. Md. 2000). (ECF No. 38 at p. 12.) Plaintiffs' position neglects the wealth of caselaw recited above and which the ALJ cited in his decision. Where the ALJ found no evidence that Plaintiffs would have accepted a placement offered to them as part of the IEP, or where the Plaintiffs declined to participate in the referral process, the delay in implementing an IEP does not result in a substantive violation. Again, the ALJ appropriately considered and rejected Plaintiffs' contention that they would have considered Pathways. There is similarly no dispute that C.V. and E.V. would not have considered Kennedy Krieger or Sheppard Pratt. C.V. and E.V. did not identify any school they would have accepted besides Fusion. In view of the foregoing, as well the remaining undisputed evidence cited above, the court finds Plaintiffs have not met their burden.

Accordingly, the court finds no substantive violation arising from CCPS's procedural violation in the context of the August 2023 IEP for the 2023-2024 school year.[10]

---

[10] Because the court concludes that CCPS did not deny A.V. a FAPE for the 2022-2023 and 2023-2024 school years, it does not reach the question whether Fusion is an appropriate placement.

## IV.    CONCLUSION

For the reasons set forth herein, by separate order, Plaintiffs' Motion will be denied, and Defendants' Motion will be granted.


September 22, 2025                                                         /s/

_____
Julie R. Rubin
United States District Judge